# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

EDWARD VERDUGO,

    Defendant.

No. 2:19-cr-02753-RB-1

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

The process of obtaining a search warrant exists to ensure that officers first gather sufficient facts indicating criminal activity before scouring through private property. Though search warrants are not always perfect or as specific as courts might like, the process itself acts as a bulwark against Fourth Amendment violations.

While investigating allegations of child abuse, officers were invited into the home of Veronica Villareal and Defendant Edward Verdugo. Once inside, they immediately smelled burnt marijuana. After Villareal's son admitted to smoking marijuana and possessing paraphernalia, officers sought a warrant to search the entire home. In that search, they discovered approximately 17.4 grams of heroin and a firearm in a black bag belonging to Verdugo. Before the Court is Verdugo's Motion to Suppress Physical Evidence (Doc. 28). Although the search warrant did not make specific reference to Verdugo's black bag, the smell of burnt marijuana and the presence of paraphernalia provided justification for the officers to search the entire home.

## FINDINGS OF FACT

Federal Rule of Criminal Procedure 12(d) provides that "when factual issues are involved in deciding a motion, the court must state its essential findings on the record." Fed. R. Crim. P. 12(d). Verdugo was charged with felon in possession of a firearm, 18 U.S.C. § 922(g)(1), possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(e), and possession with intent to distribute heroin, 21 U.S.C. § 841(a)(1), (b)(1)(C). (Doc. 1 (Compl.).) At a hearing on January 16, 2020, the Court heard testimony from Sergeant Antonio Palomares and Agent Luis Rios. Based on the hearing and the record, the Court makes the following findings of fact:

1. On May 15, 2019, at approximately 10:30 AM, New Mexico State Police Officers arrived at Villareal and Verdugo's home. (Doc. 39 (Tr.) 5:14–15.)
2. The purpose of the visit was to investigate "allegations of possible child abuse." (Tr. 9:1–2.)
3. Villareal let the officers into her home—a double-wide trailer—and answered their preliminary questions in the living room. (Tr. 9:6–9.)
4. Besides Villareal, her son and Verdugo were also present during the officers' visit. (Tr. 8:23–25, 9:1, 10:1–5.)
5. Immediately upon entering the home, Agent Ray James "smelled the odor of burnt marijuana . . . ." (Tr. 9:10–14.)
6. Villareal responded that "it was probably her son smoking marijuana and she offered to call him" from his room. (Tr. 9:15–24.)
7. The officers concluded that no one on the premises had a medical marijuana license. (Tr. 9:1–14.)

8. The officers started to question Villareal's son, and he eventually admitted smoking marijuana, having drug-related paraphernalia, and possessing "a small amount of marijuana." (Tr. 10:1–5.)

9. After this interaction, the officers decided that they would apply for a warrant to search the rest of the home. (Tr. 10:8–10.)

10. Verdugo offered to gather the paraphernalia for the officers and claimed that a warrant was unnecessary. (Tr. 11:8–12.)

11. The officers refused Verdugo's offer and informed the occupants that they would conduct a protective sweep to ensure that no other individuals were present in the home. (Tr. 11:22–25.)

12. Verdugo then asked if he could retrieve his belt from the bedroom. (Tr. 12:5–8.)

13. Palomares followed to ensure that no evidence was destroyed, but instead of immediately retrieving his belt, Verdugo entered the bathroom. (Tr. 12:9–12.)

14. As a result, Palomares lost sight of Verdugo and drew his weapon, advising Verdugo to show his hands. (Tr. 12: 16–18.)

15. Verdugo complied and exited the bathroom holding a small black bag. (Tr. 12:19–25; 13:1–2.)

16. Palomares ordered Verdugo to drop the bag, and he complied, leaving it on the bedroom floor. (Tr. 13:2–4.)

17. Verdugo proceeded to grab his belt from the bed and then exited the home so Palomares could finish the sweep. (Tr. 13:6–14.)

18. Agent Luis Rios drafted the first search warrant. (Tr. 39:11–15.)

19. In the first search warrant affidavit, the basis to search the home rested on Palomares "detect[ing] an odor of burnt marijuana." (Doc. 31-1 at 3.)

20. As a result, officers requested to search the home for "controlled substances," "paraphernalia," "writings or records showing the identity of the source(s) and/or customer(s)," "currency," and "lock boxes." (*Id.* at 4.)

21. Agent Luis Rios stated that the search warrant included the entire home because drugs are often concealed easily in hidden crevices and containers. (Tr. 42:10–17.)

22. Judge Conrad Perea of the Third Judicial District Court signed the warrant at 1:40 PM (Tr. 40:23–41:22.)

23. Rios executed the search warrant, opening the black bag upon entering the bedroom. (Tr. 43:5–7.)

24. In addition to finding heroin, Rios also discovered a firearm in Verdugo's bag. (Tr. 43:23–25.)

25. This finding prompted him to leave the residence and amend the search warrant. (Tr. 44:8–16.)

26. Rios had information about Verdugo's criminal history, so an amendment was needed because a different crime—felon in possession of a firearm—had likely been committed. (Tr. 44:3–10.)

27. The second search warrant referenced finding the black bag during the execution of the first warrant and added firearms to the list of items sought. (Doc. 31-2 at 6.)

28. The search warrant was again signed by Judge Conrad Perea at approximately 4:56 PM. (Tr. 45:11–13.)

29. The black bag was not moved from the residence or manipulated until the amended warrant was signed. (Tr. 44:23–45:6.)

30. In total, the officers found two handguns and 17.4 grams of heroin during the search. (Compl. ¶¶ 5–6.)

## CONCLUSIONS OF LAW

**I. The officers were justified in seeking a search warrant of the entire home because they included particularized facts in the affidavit that indicated criminal activity.**

The smell of burnt marijuana and admission that Villareal's son possessed paraphernalia provided justification to seek a warrant to search the whole trailer. The Fourth Amendment protects "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When officers seek to search an item or area, warrants require probable cause premised on a truthful and particularized description of what is to be searched. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). The Tenth Circuit holds that "probable cause to issue a search warrant only exists when the supporting affidavit sets forth sufficient facts that would lead a prudent person to believe that a search of the described premises would uncover contraband or evidence of a crime." *United States v. Rowland*, 145 F.3d 1194, 1204 (10th Cir. 1998) (citation omitted). Probable cause turns on the "degree of suspicion that attaches" to the given facts. *Illinois v. Wardlow*, 528 U.S. 119, 128 (2000) (quotation omitted). Officers need only a "probability or substantial chance of criminal activity," not necessarily documented proof of criminal activity. *New York v. P.J. Video, Inc.*, 475 U.S. 868, 877–78 (1986) (quotation omitted); *see also United States v. Biglow*, 562 F.3d 1272, 1281 (10th Cir. 2009) (reiterating the standard).

This standard is designed to be flexible, and courts review these decisions with deference to the magistrate. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Probable cause exists "if the totality of the information contained therein establishes a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Morgan*, 160 F. App'x 694, 697 (10th Cir. 2005) (citation omitted). In drug-related searches, the smell of marijuana can justify searching the entire home because the origination point may be difficult to locate, and additional drugs may be hidden throughout the house. *United States v. Garcia-Zambrano*, 530 F.3d 1249, 1260 (10th Cir. 2008) (when viewed on multiple occasions); *Morgan*, 160 F. App'x at 698 (when accompanied by admission). The search is still limited to the specific parameters set forth in the warrant, *see United States v. Angelos*, 433 F.3d 738, 745–46 (10th Cir. 2006), but "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search," *United States v. Ross*, 456 U.S. 798, 820–21 (1982) (footnote omitted).

The facts of the present case align closely with those in *Morgan* because the officers received an admission from Villareal's son that he possessed drugs and paraphernalia. The officers were rightfully on the premises to discuss child abuse allegations and did not smell marijuana until they were invited inside Villareal's home. The scent permeated throughout the entire double-wide trailer. While the size of the home might matter for purposes of limiting a search based exclusively on the scent, the admission that drug paraphernalia was present gave officers additional authority to conduct a comprehensive search of the premises. *See Morgan*, 160 F. App'x at 697. Though the officers only smelled marijuana in the living room at first and only Villareal's son admitted to smoking, the officers understood that drugs are often concealed in tiny compartments out of plain

sight. This makes the inclusion of specific search locations in an affidavit unrealistic. As a result, officers are given leeway in how they frame search warrants to pursue drugs because they will not likely know where to look ahead of time. Here, the smell of burnt marijuana filled the home, and the knowledge that the son possessed paraphernalia allowed the officers to cast a wider net during the search.

## II. Verdugo's black bag was included in the search because he was a resident of the home.

Verdugo lived in Villareal's home, so his personal property falls within the scope of the warrant. The Supreme Court has stated that "[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). In *Ybarra*, the Court held that although officers had a warrant to search a tavern, that did not entitle them to search patrons who happened to be on the premises during the warrant's execution. *Id.* Specifically, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* (citation omitted). Applying that holding, the Tenth Circuit has ruled that "guests have a reasonable expectation of privacy in the home of their host." *United States v. Thomas*, 372 F.3d 1173, 1176 (10th Cir. 2004) (citing *Minnesota v. Olson*, 495 U.S. 91, 98 (1990)). Conversely, the court has held that when a home is searched, a resident's belongings fall within the scope of the home, rather than acting as separate personal property. *See United States v. Holt*, 786 F. App'x 805, 808 (10th Cir. 2019) ("[Defendant] was not a mere guest; he had a connection to the premises substantial enough that his laptop fell within the warrant's scope.").

While Verdugo did not own the home, he lived with Villareal and is treated as a resident for purposes of the Fourth Amendment. He maintained no additional expectation of privacy in his personal property separate from the other individuals who lived in the home. Had he been a

7

temporary guest, it is possible that his bag would fall outside the parameters of the warrant—like the search in *Ybarra*. But Verdugo's circumstances are more closely aligned with *Holt* because he had a substantial connection to the premises; thus his personal property receives no distinct protection. As a result, a description of the black bag was not necessary in the initial warrant because a comprehensive home search incorporated Verdugo's personal items. The black bag only receives mention in the second search warrant affidavit because the officers found a gun, which altered the nature of the search and the suspected infractions. The black bag was not included in the second warrant because the officers somehow thought its initial absence problematic. Rather, it was included to provide context for the amendment to expand the search—that is, from drugs exclusively to drugs and firearms.

**III. It was reasonable for the officers to secure the premises while they waited for approval of the search warrant.**

Once the officers determined that they would seek a search warrant, they had the authority to seize the premises for a reasonable amount of time to ensure that the evidence was protected. The Supreme Court has allowed warrantless seizures to secure property while waiting for a warrant. *See Segura v. United States*, 468 U.S. 796, 806 (1984). The purpose of this seizure is to temporarily protect any potential evidence after officers determine they have probable cause to procure a warrant. *Harman v. Pollack*, 586 F.3d 1254, 1266 (10th Cir. 2009); *see also Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017) (reiterating the standard). Yet such a seizure is not unlimited, as the warrant must be secured within a reasonable amount of time. *See United States v. Munoz-Nava*, No. CR-05-99 MV, 2005 WL 8163368, at *4 (D.N.M. Oct. 27, 2005), *aff'd*, 524 F.3d 1137 (10th Cir. 2008) (ruling that a five-hour seizure was reasonable).

As discussed above, the officers had probable cause to seek a search warrant based on the burnt marijuana smell, enabling them to secure the premises until a judge ruled on the warrant.

8

They sought to search the entire home and secure the trailer until they learned whether the warrant was approved or denied. The government argues that the officers' concern "was that if [they] did not continue to secure the black bag pending the issuance of a warrant, the evidence could vanish from the premises." (Doc. 40 at 11.) Such a concern was justified, and during the period that the house was secured, no one touched or tampered with any item in the home. Further, the premises were seized for only about three hours—a reasonable timeframe to seek a warrant. Therefore, the officers properly secured the home while they waited for the warrant, and they were justified in doing so to protect potential evidence.

**IV.     Even if there was a defect in the warrant or a problem with the search, the good faith exception applies in this case.**

Even if the search warrant was overbroad or officers exceeded its scope, the good faith exception would prevent exclusion of the heroin and firearms. The good faith exception attaches when a defect exists in the warrant and excluding the evidence would not deter officers from conducting unlawful searches. *United States v. Leon*, 468 U.S. 897, 913 (1984). The Supreme Court has warned that excluding evidence should be a last resort. *Herring v. United States*, 555 U.S. 135, 140 (2009). Specifically, "[e]xclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Davis v. United States*, 564 U.S. 229, 236 (2011) (citation omitted). Still, when an affidavit is so lacking in probable cause or officers search far beyond a warrant's scope, the court will not apply the good faith exception. *United States v. Knox*, 883 F.3d 1262, 1270 (10th Cir. 2018); *see also United States v. Danhauer*, 229 F.3d 1002, 1007 (10th Cir. 2000) (discussing *Leon*).

The good faith exception is rooted in policy. That is, there exists a base presumption that relevant evidence ought to be included, and minor procedural defects should not prevent courts

from considering it. When an affidavit to attain a search warrant is demonstrably false, however, or when officers grossly exceed the scope of a warrant, then the good faith exception may not apply. Here, the warrant appears to be reasonably constructed—based on the marijuana scent and paraphernalia. This allowed the officers to obtain a warrant to search the entire home, which included Verdugo's black bag. Warrants could always include additional particularized detail to specify the parameters of a search, but when officers make a good faith effort to write a detailed affidavit, courts should not take the extraordinary measure of excluding evidence for minor defects. While the warrants at issue included particularized facts to justify the search of the home and the black bag, the good faith exception would apply as a backstop if the scope was exceeded. Taking these findings of fact and conclusions of law, the Court will deny Verdugo's Motion to Suppress the heroin and firearms found during the search.

**THEREFORE**,

**IT IS ORDERED** that Verdugo's Motion to Suppress Physical Evidence (Doc. 28) is **DENIED**.

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**